UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LORRAINE CONCEPCION,                              :

        Plaintiff,                              :

        vs.                              :          No. 3:09cv01376(SRU)(WIG)

MICHAEL J. ASTRUE,                              :
Commissioner of the
Social Security Administration,                  :

        Defendant.                          :
--------------------------------------------------------------X

<u>RECOMMENDED RULING ON PENDING MOTIONS</u>

      Plaintiff, Lorraine Concepcion, has appealed the final decision of Defendant, the

Commissioner of the Social Security Administration, denying her application for Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and Title

XVI of the Social Security Act.  Section 205(g) provides that "the [district] court shall have the

power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying,

or reversing the decision of the Commissioner, with or without remanding the cause for a

rehearing."  42 U.S.C. § 405(g).  Pursuant to section 205(g), Plaintiff has filed a motion for an

order reversing the decision of the Commissioner or, in the alternative, for an order remanding

the case for a rehearing [Doc. # 18].  Defendant has responded with a motion to affirm [Doc. #

25].  After a thorough review of the administrative record and the parties' motions, the Court

recommends that the decision of the Commissioner be reversed and remanded for further

proceedings consistent with this opinion.

<u>Standard of Review</u>

Under 42 U.S.C. § 405(g), the district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  Judicial review of the Commissioner's decision is limited.  <u>Yancey v. Apfel</u>, 145 F.3d 106, 111 (2d Cir. 1998).  It is not the Court's function to determine <u>de novo</u> whether the claimant was disabled.  <u>See</u> <u>Schaal v. Apfel</u>, 134 F.3d 496, 501 (2d Cir. 1998).  Rather, the Court must review the record to determine first whether the correct legal standard was applied and then whether the record contains "substantial evidence" to support the decision of the Commissioner.  42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...."); <u>see</u> <u>Bubnis v. Apfel</u>, 150 F.3d 177, 181 (2d Cir. 1998); <u>Balsamo v. Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998).  To determine whether the Commissioner's decision is supported by substantial evidence, the Court must consider the entire record, examining the evidence from both sides.  <u>Williams v. Bowen</u>, 859 F.2d 255, 258 (2d Cir. 1988).  Substantial evidence need not compel the Commissioner's decision; rather substantial evidence need only be that evidence that "a reasonable mind might accept as adequate to support [the] conclusion" being challenged.  <u>Veino v. Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002) (internal quotation marks and citations omitted).  "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." <u>Genier v. Astrue</u>, — F.3d. —, 2010 WL 2105081, at *1 (2d Cir. May 27, 2010) (internal quotation marks and citation omitted).  Thus, the role of this Court is not to decide the facts anew, nor to reevaluate

2

the facts, nor to substitute its judgment for that of the Commissioner but rather to determine

whether substantial evidence of record supports the Commissioner's decision.  See Eastman v.

Barnhart, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

Discussion

Plaintiff raises nine grounds for reversing the Commissioner's decision, which will be

considered *ad seriatim.*

1.  Did the ALJ err in failing to include in the record the medical expert's opinion he references
in his Decision?

In section 10 of his Decision, the ALJ states: "An opinion from a medical expert was

obtained by the undersigned Administrative Law Judge."  (R. 19).  The record contains no such

report.  Plaintiff correctly argues that it would have been improper for the ALJ to rely on a report

that is not part of the record.  The Government does not disagree but maintains that this statement

was a mistake and that there never was a medical expert opinion obtained by the ALJ.

As the Government notes, a medical expert opinion is not referenced anywhere else in the

ALJ's Decision.  The only mention of it is in section 10 of his Decision, wherein he also states

that he disagrees with the decision of the Federal Reviewing Official ("FRO"), when in fact he

concurred with the FRO.[1]  See Decision of FRO (R. 47-54).  Thus, it appears that this entire

section was included in error and that the reference to the medical expert's opinion was harmless

error.

Although Plaintiff insists a remand is necessary for the ALJ to provide her with a copy of

---

[1]  The Regulations provide that while the ALJ will not consider the FRO's decision as
evidence, his written decision must explain in detail why the ALJ agrees or disagrees with the
substantive findings and the overall rationale of the FRO's decision.  20 C.F.R. § 405.370.

the medical expert's opinion, a remand for this purpose would be an exercise in futility for it appears that no such report ever existed.   Nevertheless, because the Court is remanding this case for other reasons, upon remand the ALJ should clarify that he did not rely on a medical expert and should explain why he agreed with the FRO's opinion.  See 20 C.F.R. § 405.370.  If, by chance, he did in fact have a medical expert's report, this must be provided to Plaintiff's counsel.

II. Did the ALJ fail to consider the correct diagnoses for Plaintiff's mental impairments?

The ALJ concluded that Plaintiff "has the following severe impairments: polysubstance abuse, chronic back pain, left side hearing loss and depression."  (R. 12).  Plaintiff argues that depression is a symptom, not a diagnosis, and that the ALJ improperly ignored her treating doctors' diagnoses of depressive disorder not otherwise specified ("NOS"), mood disorder, and psychosis NOS or schizophrenia and improperly substituted his own judgment for competent medical opinion.  The Court finds no error in this regard.

Plaintiff cites no authority for the proposition that depression cannot be a diagnosis or that the ALJ is limited to the list of psychiatric disorders set forth in the DSM-IV.[2]  Moreover, while the DSM-IV does not list "depression" per se as a psychiatric disorder, it does include a

---

[2]  The Diagnostic and Statistical Manual of Mental Disorders (DSM) is published by the American Psychiatric Association and provides standard criteria for the classification of mental disorders. The last major revision was the fourth edition published in 1994, which is referred to as the DSM-IV.  The DSM-IV organizes each psychiatric diagnosis into five levels (axes) relating to different aspects of disorder or disability:
> Axis I: Clinical disorders, including major mental disorders, and learning disorders
> Axis II: Personality disorders and mental retardation (although developmental disorders, such as Autism, were coded on Axis II in the previous edition, these disorders are now included on Axis I)
> Axis III: Acute medical conditions and physical disorders
> Axis IV: Psychosocial and environmental factors contributing to the disorder
> Axis V: Global Assessment of Functioning ("GAF").
http://en.wikipedia.org/wiki/Diagnostic_and_Statistical_Manual_of_Mental_Disorders.

long list of more specific depressive disorders.

In a letter to the ALJ prior to the hearing, Plaintiff's counsel himself described Plaintiff's "disabling medical conditions" as "chronic back pain, <u>depression</u>, polysubstance abuse in remission, and asthma." (R. 157) (emphasis added). And, Plaintiff's own doctors frequently referred to her depression. Other than her history of polysubstance abuse, Plaintiff's over-riding mental condition discussed throughout the medical records was her depression.

The impression of Dr. Jesus A. Lago,[3] a consultative examiner for the Connecticut DDS, who saw Plaintiff on April 27, 2007, was that Plaintiff 's Axis I disorder was <u>major depression</u>, a single episode, mild to moderate. (R. 171) (emphasis added).

In July 2007, Plaintiff was admitted to Norwalk Hospital after being assaulted by her boyfriend. After a urine toxicology screen revealed the presence of cocaine and alcohol and Plaintiff made a comment about feeling suicidal, she was admitted on a voluntary basis to the inpatient psychiatric unit for three days, where she was treated by Dr. Harold Ginsberg. Her diagnosis on discharge was polysubstance dependence (alcohol and cocaine) with secondary mood disorder.[4] (R. 190-92). Treatment notes from the Psychiatry Department during this hospitalization refer to her dysphoria, feelings of hopelessness, crying episodes, and seeing ghosts. The therapist noted that she was unsure if Plaintiff's <u>depression</u> was substance-induced. She listed Plaintiff's Axis I diagnosis as <u>depression disorder</u> NOS (R. 194 & 195) (emphasis

---

[3] Dr. Lago was not aware of Plaintiff's history of substance abuse and, therefore, it did not figure into his diagnosis. <u>See</u> R. 170.

[4] A mood disorder is the term given for a group of diagnoses in the DSM-IV classification system where a disturbance in the person's mood is thought to be the main underlying feature. Two groups of mood disorders are broadly recognized: depressive disorders and bipolar disorders. http://en.wikipedia.org/wiki/Mood_disorder.

added).  Plaintiff was referred to an individual out-patient treatment program, but she failed to

attend the intake appointment.  (R. 224).  Ultimately, she did have an intake assessment in

September 2007 but once she found out that she could not obtain pain medication that she "felt

she needed very urgently," she was "not very interested in continuing treatment at the Clinic."

(R. 224).

       In October 2007,  Dr. Schuetz-Mueller described Plaintiff as suffering from <u>ongoing</u>

<u>depression</u>, which in May of 2008, Plaintiff rated as an "8" on a "1-to-10" scale.  (R. 228)

(emphasis added).  Plaintiff wanted to bring her depression down to a "2" after the completion of

treatment.  Her symptoms included isolating, no motivation, crying frequently, hopelessness, and

some suicidal ideation.  (R. 228).  In July 2007, she reported that she had tried to cut herself with

a knife and used a razor blade the weekend prior to this assessment.  (R. 228).   She had a history

of cocaine and alcohol dependence, self-medicating for pain.  She last used cocaine on

September 5, 2007.  (R. 228).   At the time of this assessment, she was taking antidepressants,

Prozac, Trazodone, and Risperdal.  Dr. Schuetz-Mueller listed her DSM-IV Axis I diagnosis as

mood disorder NOS. (R. 229).   The clinical assessment was mood disorder NOS as exhibited by

<u>depression</u>.  Her doctor estimated that she would need three months of treatment.  The treatment

plan was for Plaintiff to see a therapist once a week and Dr. Schuetz-Mueller for medication

management.  Plaintiff refused group therapy and the 12-step program[5] at that time.  (R. 231).

However, on July 1, 2008, a form for transfer was completed indicating that Plaintiff has not

attended the individual out-patient program and she was being discharged to medication

---

    [5]  The 12-step program is a method for treating various types of addiction, including
alcohol and drugs, that has been used by groups such as Alcoholics Anonymous, Narcotics
Anonymous and others. http://en.wikipedia.org/wiki/Twelve-step_program.

management only.  (R. 235).  Notes from July 10, 2008 again indicate a diagnosis of mood

disorder NOS (R. 234), and in October 2008, an Axis I diagnosis of polysubstance dependence

and mood disorder NOS.  (R. 237).  Her GAF Score was 60.[6]  (R. 237).   Her medications in

October 2008 were Prozac, Risperdal, Trazodone, Cogentin,[7] and Ativan.[8]  Her problems were

listed as:

> Problem # 1: Polysubstance Dependence as evidenced by using alcohol and cocaine to
> medicate her physical pain.
> Problem # 2: Mood Disorder NOS as evidenced by ongoing depression, isolating, no
> motivation, crying, insomnia, hopeless, past history of suicidal ideation, long history of
> daily reliance on alcohol and cocaine to self-medicate, and recently complaints of audio
> and visual hallucinations.

(R. 237).

The last record from Dr. Schuetz-Mueller is dated April 17, 2009, at which time Plaintiff

was having difficulties with her medications, which were causing nightmares and sleep

interruption,  and she reported auditory hallucinations.  Plaintiff reported mood problems, at

times not making it out of bed, and panic attacks now and then. The doctor noted that she had

been clean from crack cocaine for one and one-half years.  (R. 272).   Plaintiff was taking Prozac

and Cogentin and started Zyprexa.[9]  She had not been keeping her appointments for therapy. The

---

[6] The GAF is a scale promulgated by the American Psychiatric Association to assist in tracking the clinical progress of individuals with psychological problems.  Kohler v. Astrue, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (citing the Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000)).

[7] Cogentin is used to reduce the side effects of certain antipsychotic medicines. http://en.wikipedia.org/wiki/Benzatropine.

[8] Ativan is used to treat anxiety disorders.  http://www.drugs.com/ativan.html.

[9] Zyprexa is used to treat the symptoms of psychotic conditions such as schizophrenia and bipolar disorder.  It is sometimes used in combination with another medication such as

doctor's diagnosis (Axis I) was rule out schizophrenia, "po[10] cocaine dependence in sustained

remission," and psychosis NOS.  (R. 272).  This is the only mention of schizophrenia in the

records, and it was a diagnosis to be ruled out.  There is no indication if an actual diagnosis of

schizophrenia was ever made.  See Cross v. Astrue, No. 08-CV-0862, 2010 WL 2399379, at *11

(N.D.N.Y. May 24, 2010), adopted by 2010 WL 2399346 (N.D.N.Y. June 10, 2010).

Significantly, this medical record post-dates the ALJ's decision.  There was no error in the ALJ's

failure to include schizophrenia as a severe impairment.

        The Norwalk Community Health Center records also repeatedly refer to her depression.

In November 2007, Plaintiff was seen for low back pain, asthma and depression.  (R. 266).  Her

depression was being managed by her psychiatrist and the doctor noted that she was doing better

on Seroquel and Prozac. (R. 266).  In March 2008, her depression was reported as worsening

with recent suicidal thoughts.  (R. 267).  Plaintiff was scheduled to see her psychiatrist that

afternoon.  In September and December, the records again note that she was taking Risperdal and

Trazodone for depression.  (R. 268 & 269).

        Thus, the Court disagrees with Plaintiff's assertion that the ALJ failed to consider the

correct diagnosis of Plaintiff's mental illness.  The ALJ's conclusion that Plaintiff suffered from

the severe impairment of depression is supported by substantial evidence in the record.

        Plaintiff also urges the Court to find that the ALJ erred in failing to consider Listings

12.02A5 and 12.08A4, both of which include depression as a symptom.  The ALJ evaluated

---

Prozac to treat depression after other medications have been proved to be unsuccessful in treating
the symptoms.  http://www.drugs.com/zyprexa.html.

        [10]  "PO" stands for "by mouth, orally."
http://www.medilexicon.com/medicalabbreviations.php.

Plaintiff's mental impairments under Listings 12.04[11] (Affective Disorders) and 12.09 (Substance Addiction Disorders). (R. 12-15).  Consultant Dr. Lindsay Harvey reviewed Plaintiff's medical records and found evidence of an affective disorder under Listing 12.04, but did not find evidence substantiating the presence of an organic mental disorder under Listing 12.02 or a personality disorder under Listing 12.08.  (R. 176-189).

Additionally, the medical evidence in the record does not establish that Plaintiff's mental impairment met or equaled the criteria of Listing 12.02 or Listing 12.08.  Listing 12.02 pertains to organic mental disorders and requires a history and physical examination or laboratory tests demonstrating the presence of a specific organic factor etiologically related to the abnormal state and loss of previously acquired functional abilities.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The record contains no objective medical evidence of a brain abnormality that would support a finding of an organic mental disorder under Listing 12.02.  As for Listing 12.08, a personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress.  Characteristic features are typical of the individual's long-term functioning.  Id.  Again, the medical records fail to substantiate the presence of a personality disorder meeting the requirements of Listing 12.08.  Accordingly, the Court finds no error in the ALJ's failure to analyze Plaintiff's mental impairments under either Listing 12.02 or 12.08.[12]

---

[11]  Under Listing 12.04, affective disorders are characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  The ALJ found that Plaintiff's depression met the required level of severity for Listing 12.04 in that she exhibited at least four of the criteria set forth in subsection A and at least two of the criteria in subsection B.  (R. 15).

[12]  While Plaintiff refers to Listing 12.02A5 and Listing 12.08A4, a claimant must meet not only the requirements of one of the "A" criteria but also at least two of the functional

III.  Whether the ALJ committed factual errors in his evaluation of the evidence?

Plaintiff next argues that the ALJ erred in evaluating the evidence in reaching seven

different conclusions.

First, she challenges the ALJ's finding that there was no evidence to corroborate her

claims of chronic, disabling pain.  Plaintiff fails to include the ALJ's complete finding.  The ALJ

stated "[i]n terms of the claimant's alleged back pain, there is simply no evidence to corroborate

her claims of chronic, disabling pain that rates 8 out of 10 even when she takes Vicodin every 12

hours" (R. 16-17), as she had testified at the hearing.  There was no radiographic evidence to

support her complaints of disabling pain (R. 167, 168), as the ALJ noted.  A CT scan performed

in February 2007 was negative for any abnormalities.  (R. 191).  Physical therapy notes from

December 2007 to January 2008 indicate that her pain ranged from 4 to 6, depending on the level

of activity, and describe it as moderate.  (R. 250, 252).  Plaintiff received only limited physical

therapy for her back problems, to which she responded.  (R. 30, 250).  A pain assessment

performed by her treating psychiatrist rated Plaintiff's pain as a "2" on a 1-to-10 scale, and

Plaintiff reported that her pain was alleviated by medication.  (R. 230).  At the time of the

hearing, she was able to work part-time as a cashier in a liquor store, about 8 to 10 hours a week.

(R. 26, 33-34).  The Court finds that the ALJ's conclusion was supported by substantial evidence.

Second, Plaintiff challenges the ALJ's conclusion that there was a discrepancy in

Plaintiff's report to Norwalk Hospital in February 2007, that she had no previous problems.  (R.

169).  Plaintiff appears to be arguing that Norwalk Hospital was already "aware" that she had

been treated for back pain, as she had been treated there in 1999 for lower back pain and,

_____

limitations under paragraph B.   20 C.F.R. Pt. 404, Subpt. P, App. 1.

therefore, she did not need to report this prior problem.    Again, Plaintiff has taken the ALJ's

statement out of context.  The ALJ was comparing Plaintiff's statement at the Norwalk Hospital

to her allegation in her application for benefits that she had been disabled since July 10, 2006,

seven months earlier.   The fact that she was treated at the same hospital eight years earlier for

low back pain has little, if any, relevance to her current disability claim.   Plaintiff worked for

seven years at a pizza parlor after the 1999 episode; she reached all of her treatment goals with

therapy as of May 1999, see R. 261 (noting that she felt good, all goals achieved, and she was

being discharged after three weeks of therapy); and there is no indication that she received any

treatment for her back until the incident with her boyfriend that led to her hospital visit in

February 2007.  See R. 265 (Norwalk Comm. Health Center report dtd. 6/15/07 stating "[h]as

tried PT in past, some relief of [symptoms]; last in 1998-99").  The Court finds no error in the

ALJ's noting an inconsistency between her statement to the doctor in February 2007 that she

never had prior problems and her statement in her disability application, which alleged an onset

of disability in July 2006.

Third, Plaintiff argues that the ALJ erred in finding that her denial of substance abuse to

Dr. Lago rendered her not credible.  Consultative physician, Dr. Jesus Lago, saw Plaintiff on

April 30, 2007, for the Connecticut Disability Determination Services.  At that time, she reported

that she had no prior substance abuse history and stated that she was not taking any medication

for pain or depression.  (R. 170).  Less than three months later, however, she was admitted to the

Norwalk Hospital emergency room and was found to be intoxicated with cocaine.  (R. 190).   She

admitted to using cocaine daily since the age of 20.  (R. 225).  Her primary diagnosis on

discharge was "polysubstance dependence (alcohol, cocaine) with secondary mood disorder." (R.

192).

Denial is a well-known aspect of drug and alcohol addiction.  Thus, it is not surprising that Plaintiff concealed her drug dependence from a state agency doctor.  Nevertheless, her statements to Dr. Lago were not true.  The ALJ did not err in citing to her lack of credibility in this regard.  Significantly, as discussed *infra*, the ALJ did not base his entire credibility assessment on this one misstatement.[13]

Fourth, Plaintiff argues that the ALJ committed a factual error in reviewing the evidence when he found that Plaintiff's diagnosis of polysubstance dependence upon discharge from Norwalk Hospital indicated that her mental impairment was not as severe as alleged.  Once again, Plaintiff has taken the ALJ's statement out of context.  The ALJ noted that upon discharge, Plaintiff was given a treatment plan for continued out-patient treatment, which she did not seek. It was her failure to seek treatment that was the basis for his conclusion that her mental impairment was not as severe as alleged.  The ALJ could properly rely on her lack of treatment in assessing the severity of her impairment.  See SSR 96-7p, at *7 (July 2, 1996) (noting that an individual's statements may be less credible if the medical records show that the individual is not following the prescribed treatment and there are no good reasons for the failure).

Fifth, Plaintiff challenges the ALJ's conclusion that her mental impairment was not as severe as alleged because she was discharged from care on July 10, 2008.  The ALJ's conclusion

---

[13]  As one court has noted, "the law provides little guidance on how to analyze an alcoholic's credibility.  The customary credibility analysis was constructed to evaluate the truthfulness of a claimant's statements that she does suffer from an impairment - usually pain. When the relevant statement is that of an alcoholic claiming he has stopped drinking, the analysis is turned on its head.  Where the ALJ would ordinarily be evaluating an assertion that an impairment exists, he must now evaluate a denial that an impairment exists."  McCall v. Apfel, 47 F. Supp. 2d 723, 730 (S.D.W. Va. 1999).

was not based upon her discharge but upon the reason for her discharge - i.e., that she failed to

attend the out-patient treatment program and that she did not follow through with the treatment

plan prescribed in October 2008.  (R. 17-18).

       Sixth, Plaintiff cites as factual error the ALJ's statement that no physician had opined that

Plaintiff was disabled within the meaning of the regulations.  Plaintiff cites to a prescription note

from Dr. Monic Roengvarephoj dated December 9, 2008, that states: "Patient with chronic back

pain, hx of alcohol/cocaine use, not able to work. Would she be a candidate of CBT[14] or

counseling." (R. 248).  The ALJ was aware of this note, but afforded it no probative value

because it was vague and conclusory and unsupported by any specifics.  (R. 18).   Dr.

Roengvarephoj had treated Plaintiff at the Norwalk Health Center from October 2007 to

December 2008.  There is little evidence in her records, however, that would support a

conclusion that Plaintiff was unable to work.  In October 2007, Plaintiff was seen for back pain,

for which she was requesting Vicodin, and left-sided ear discomfort.  (R. 265).  In November

2007, Dr. Choudhury saw Plaintiff at the Clinic and noted that she was doing well except for

back pain, for which she was taking Naproxen.  Her depression seemed better.  She was taking

Senoquel and Prozac and was being managed by a psychiatrist.  Her asthma symptoms were also

stable on Albuterol.  He referred her to physical therapy.  (R. 266).  In March 2008, she reported

that the physical therapy had been helpful and that she was still doing exercises at home.  She

requested a refill on her medications.  Her depression, however, was worsening and she recently

had suicidal thoughts.   She was seeing her psychiatrist later in the day.  (R. 267).   No significant

changes were noted at her next visit in September.  (R. 268).  In December, the day the

---

[14]  Presumably "CBT" refers to cognitive behavioral therapy.

prescription note was written, Dr. Roengvarephoj questioned whether Plaintiff's back pain was due to a mechanical back injury and suggested that it might be "psych. related." Her notes state "recommend to d/w [discuss with] psych, for now cont. [continue] Naproxen." (R. 269). Dr. Roengvarephoj's question about whether Plaintiff's back pain might be "psych related" may have been the impetus for the prescription note inquiring as to whether Plaintiff would be a candidate for CBT or counseling. However, because the medical records from Norwalk Community Health Center do not support the doctor's conclusion that Plaintiff was unable to work, the ALJ did not err in failing to give it controlling weight. <u>See</u> SSR 96-2p, 1996 WL 374188, at *3 (July 2, 1996) (a treating source's opinion must be well-supported by medically acceptable clinical and diagnostic techniques in order to be afforded controlling weight).

Seventh, Plaintiff faults the ALJ's conclusion that "[t]he state agency medical consultants have concluded that the claimant . . . can work within a schedule without requiring extra supervision" and that "[t]here is nothing in this record that would warrant a different conclusion." (R. 18). Dr. Harvey performed a Mental RFC Assessment and concluded that Plaintiff was not significantly limited in her ability to perform activities within a schedule and in her ability to sustain an ordinary routine without special supervision. (R. 172). These findings support the ALJ's statement.

<u>IV.  Whether the Treating Physician Rule requires a finding of disability?</u>

Plaintiff next argues that the well-known "treating physician rule" requires a finding of disability based upon the opinion of Dr. Roengvarephoj that Plaintiff cannot work, which is allegedly supported by the 48 pages of records from the Norwalk Community Health Clinic and the Norwalk Hospital; Plaintiff's GAF scores that were usually below 50; and the opinion of Dr.

14

Schuetz-Mueller that Plaintiff was disabled even if she were completely abstinent from all drugs and alcohol.

The Court has previously discussed *supra* why the prescription note of Dr. Roengvarephoj need not be given controlling weight.

As for Plaintiff's GAF scores, when Plaintiff was admitted to Norwalk Hospital in July 2007 for alcohol and cocaine dependence, her GAF score was 30. However, Dr. Ginsberg estimated that it was 50 to 60 the past six months. (R. 192). A psychiatric assessment performed by Dr. Schuetz-Mueller in November 2007 showed her then current GAF score to be 60. (R. 227). In May 2008, she down-graded it to 43-53 (R. 231), and in July 2008, it was 48-50. (R. 234). In October 2008, it was back up to 60. (R. 237). As Plaintiff correctly notes, a GAF score under 50 indicates serious symptoms or a serious impairment in social or occupational functioning. However, other than when Plaintiff was hospitalized for polysubstance abuse and in mid-2008, her GAF scores were 60, which is at the high end of moderate impairment in occupational functioning.[15] The record also indicates the Plaintiff was working part-time as a cashier in a liquor store approximately eight to ten hours a week, which would indicate that her occupational functioning was not at the serious level.

Last, Plaintiff relies on the hand-written notes of Dr. Schuetz-Mueller in response to a letter from Plaintiff's counsel after the ALJ rendered his unfavorable decision.[16] The doctor indicated that Plaintiff had been in remission for one and one-half years and that she believed

---

[15] http://en.wikipedia.org/wiki/Global_Assessment_of_Functioning.

[16] Although this evidence was not before the ALJ, evidence submitted after the ALJ's decision becomes part of the administrative record for judicial review. Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996).

that absent any drug or alcohol abuse Plaintiff would still suffer from disabling psychiatric impairments.  (R. 271).  Defendant regards this medical opinion as highly unreliable because the doctor's own treatment notes from October 2008 indicate that Plaintiff was continuing to abuse substances to self-medicate.  (R. 237).  It is not clear to the Court whether the doctor's records from October 2008 reflect an on-going substance abuse problem or whether this was something in the past.  Parts of the record are illegible.  The record lists two goals for Plaintiff: "Prob #1: Polysubstance Dependence aeb[17]: using alcohol and cocaine to medicate her physical pain; Prob #2: Mood Disorder NOS aeb: ongoing depression . . . <u>long hx</u> of daily reliance on alcohol and cocaine to self-medicate."  (R. 237) (emphasis added).  Her records from April 2009 support the statement in her letter that Plaintiff had been clean from crack cocaine for one and one-half years and that she only drank alcohol socially now and then.  (R. 272).  However, records from the Norwalk Community Health Center from December 2008 indicate that Plaintiff was encouraged to quit smoking and drinking, although there is no mention of cocaine use.  (R. 269).   Plaintiff herself testified that she had not been used cocaine since September 2007.  (R. 39).  The Court assumes that Dr. Schuetz-Mueller's notes from October 2008 were referring to Plaintiff's past history of polysubstance abuse.

The regulations promulgated by the Social Security Administration provide that a treating physician's opinion on the issues of the nature and severity of a claimant's impairments will be given "controlling weight" if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in

---

[17] "Aeb" stands for "as evidenced by."

[the] record."[18]  20 C.F.R. §§ 416.927(d)(2), 404.1527(d); see Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Veino , 312 F.3d at 588; Shaw, 221 F.3d at 134-35; Schaal, 134 F.3d at 503-05.  The rationale underlying the treating physician rule is that more weight should be given to opinions from treating sources because those sources are more likely to have detailed knowledge and understanding of the claimant's medical impairment.  See Gonzalez v. Apfel, 23 F. Supp. 2d 179, 192 (D. Conn. 1998).  "The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient."  Id. (internal citations and quotation marks omitted).   The Second Circuit has set forth several factors that must be considered when the treating physician's opinion is not given controlling weight: (1) the frequency of examination and the length, nature and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; and (4) whether the opinion is from a specialist.  Clark v. Comm'r of Social Security, 143 F.3d 115, 118 (2d Cir. 1998).

Here, the Court finds that the ALJ did not err in failing to afford controlling weight to Dr. Schuetz-Mueller's opinion that Plaintiff would still suffer disabling psychiatric impairments

---

[18]  "A statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that [the claimant is] disabled."  20 C.F.R. §§  404.1527(e), 416.927(e); see Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000).  The regulations specifically provide that the determination of whether a claimant is disabled is a determination to be made by the Commissioner.  20 C.F.R. § 404.1527(e); Jordan v. Barnhart, 29 Fed. Appx. 790, 793-94, 2002 WL 448643, at *3 (2d Cir. Mar. 22, 2002)(unpublished decision); Bond v. Social Security Administration, 20 Fed. Appx. 20, 21, 2001 WL 1168333, at *2 (2d Cir. Sept. 27, 2001)(unpublished decision); Parker v. Callahan, 31 F. Supp. 2d 74, 77 (D. Conn. 1998).

absent any drug or alcohol abuse because her opinion in inconsistent with other substantial evidence in the record.  Moreover, no deference is owed to a physician's statement that a claimant is "disabled," since that determination is a legal conclusion - not a medical determination - reserved for the ALJ, the Commissioner and the courts.  See Green-Younger, 335 F.3d at 106; Michels v. Astrue, 297 Fed. Appx. 74, 75 (2d Cir. 2008).

When Plaintiff first saw Dr. Schuetz-Mueller for a psychiatric assessment at Norwalk Hospital in September 2007, she did "not endorse mood problems, did not endorse psychiatric illness.  Did not endorse paranoia, suicidal/homicidal ideation, no panic, no anxiety, no paranoia, no hallucinations of any sort.  She was alert and oriented" and future oriented.  Her focus was on obtaining pain medications.  (R. 226).  The only diagnosis was polysubstance dependence and insomnia.  (R. 226).  In November 2007, Dr. Choudhury observed that Plaintiff's depression was better and her suicidal ideation was managed by her psychiatrist on Seroquel and Prozac.  (R. 266).  In May 2008, when Plaintiff returned to see Dr. Schuetz-Mueller, she was described as cooperative, passive, with a normal stream of thought, composed with appropriate affect, and alert with normal orientation and memory, although she claimed to see ghosts and shadows and to hear voices.  The doctor's diagnosis was mood disorder NOS and polysubstance dependence.  (R. 230).  In July 2008, after Plaintiff did not attend the individual out-patient therapy program, she was discharged to medication management only.  (R. 235).

Plaintiff, in her application for disability benefits, made no mention of her mental impairments.  She stated that her back problems prevented her from working.  (R. 108).  She did, however, mention in her activities of daily living questionnaire that she was depressed because of her lack of mobility.  (R. 120).  She further stated that she made three meals a day; she cleaned

with the help of her son; she took care of her pets; she was able to shop; she was able to go out

by herself; she could follow instructions and get along with authority figures.  (R. 120).   At the

hearing, she testified that she was working eight to ten hours per week as a cashier.  (R. 25-26).

A case analysis prepared by Dr. Katherine Tracy in April 2007, stated that Plaintiff could

maintain personal hygiene, provide care for her son, prepare meals, use public transportation, go

shopping, manage her own finances, and socialize regularly.  (R. 169).  A vocational analysis

performed on May 7, 2007, indicated that Plaintiff was able to understand and remember

instructions of average complexity and to carry out multi-step instructions.  She was able to make

simple work-related decisions.  She was able to interact with her co-workers and the public.  (R.

134).

Dr. Jesus Lago performed a consultative examination of Plaintiff.  Plaintiff reported that

she could not work because of her back pain.  He observed that she was socially appropriate and

"engageable" but she did have some mild psychomotor slowing.  Her mood was depressed and

her affect constricted.  She was not acutely suicidal, homicidal or psychotic.  Her insight and

judgment were fair and her cognition intact.  She was able to follow simple commands and

instructions and followed the flow of the interview relatively well.  His impression was major

depression, single episode, mild to moderate.  He felt that with proper psychiatric care and

follow-up, her condition should improve.  (R. 171).

Dr. Harvey completed a mental RFC assessment form in May 2007 and noted that

Plaintiff had not received any psychiatric treatment up to that point in time.  She reported that

Plaintiff could understand and follow simple and detailed instructions; that she was able to carry

out simple tasks, make simple work decisions, and work within a schedule without extra

19

supervision/  Her attention and concentration were within normal limits.  She had some difficulty

carrying out detailed tasks in a timely manner.  Her appearance was normal, she could ask

questions and relate adequately to supervisors, coworkers, and the general public.  Plaintiff

reported that she got along with others.  There was no evidence of significant limitations in this

area.  She felt that Plaintiff would be able to adapt to work changes and travel independently, but

would have some difficulty making independent plans due to her depression.  (R. 174).

The evidence of record, including Dr. Schuetz-Mueller's own records, simply does not

support her response to the attorney's question that Plaintiff would still suffer from a disabling

psychiatric impairment absent any drug or alcohol abuse.  Accordingly, the ALJ did not err in not

giving her opinion controlling weight.

V.  Whether Plaintiff 's mental impairment meets or equals one of the Listings?

Plaintiff next contends that her mental impairments meet or equal the requirements of

Listing 12.03 and Listing 12.04.  While the ALJ found that Plaintiff's mental impairment would

meet Listing 12.04 when she was abusing alcohol or drugs, he found that her impairment did not

meet the Listing when she was not.  He did not address Listing 12.03.

Plaintiff asserts that she meets Listing 12.03 because she was diagnosed with Psychosis

NOS and Schizophrenia.  Contrary to Plaintiff's assertions, as discussed above, Plaintiff was

never diagnosed with Schizophrenia.  One note contains a reference to "r/o [rule out]

schizophrenia" (R. 272), but there is no indication if this diagnosis was ever actually made.   In

April 2009, after the ALJ's decision, Dr. Schuetz-Mueller did include a diagnosis of Psychosis

NOS for the first time.   Additionally, Dr. Harvey made no finding of a schizophrenic, paranoid,

or other psychotic disorder.  (R. 178).   There, there was no error in the ALJ's failure to consider

Listing 12.03.

As for Listing 12.04, there is no evidence in the record, as discussed *infra*, the ALJ erred in not evaluating all of Plaintiff's functional limitations for each of the four "B" criteria.  The regulations require the ALJ to document "specific findings" as to Plaintiff's degree of limitation in each of these functional areas.  20 C.F.R. §§ 404.1520a(e)(2), 416.920a(e)(2).  The Court finds that a remand is necessary for the ALJ to perform this analysis and document his findings.

VI.  Whether the ALJ properly evaluated Plaintiff's mental impairments?

Plaintiff next argues that the ALJ erred by not following the "special technique" set forth in 20 C.F.R. § 404.1520a for evaluating mental impairments.  Specifically, she asserts that he did not include a specific finding as to the degree of limitation in each of the four functional areas described in paragraph (c), which are the same functional areas as the "B" criteria discussed above.  Defendant has not addressed this argument other than stating in a footnote that the ALJ listed the four criteria and specifically discussed two of them in connection with his finding that Plaintiff met Listing 12.04 when she was abusing substances.  (Def.' Mem. at 19 n.7).

In Kohler v. Astrue, 546 F.3d 260, 266 (2d Cir. 2008), the Second Circuit reviewed the regulatory requirements governing the evaluation of the severity of mental impairments.  See 20 C.F.R. § 404.1520a.  The regulations require the reviewing authority to "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c)," 20 C.F.R. § 404.1520a(b)(2), which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.  20 C.F.R. § 404.1520a(c).  "[I]f the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified, then the

21

reviewing authority will conclude that the claimant's mental impairment is not 'severe' and will deny benefits." Kohler, 546 F.3d at 266 (citing 20 C.F.R. § 404.1520a(d)(1)). If the claimant's mental impairment is severe, the reviewing authority will determine whether the impairment meets or is equivalent in severity to any listed mental disorder. Id. If so, the claimant will be found to be disabled; if not, the reviewing authority will then assess the claimant's RFC. 20 C.F.R. § 404.1520a(d)(3). "Importantly, the regulations require application of this process to be documented." Kohler, 546 F.3d at 266 (citing 20 C.F.R. § 404.1520a(e)). While the ALJ is no longer required to complete a Psychiatric Review Technique Form ("PRTF"), the regulations explicitly provide that the ALJ's decision "'*must* include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.'" Id. (emphasis in original) (citing 20 C.F.R. § 404.1520a(e)(2)). Here, as in Kohler, the ALJ failed to comply with the regulations in that his decision does not contain specific findings as to each of the four functional areas set forth above. See Id. at 266.

The consequences of noncompliance with 20 C.F.R. § 404.1520a were a matter of first impression in the Second Circuit for the Kohler Court. The Court observed that other circuits have not hesitated to remand where the ALJ's noncompliance resulted in an inadequately developed record with respect to these four functional areas. Id. at 267 (citing cases). Because the Court was unable to identify findings regarding Kohler's limitations in each of the functional areas and could not discern whether the ALJ properly considered all of the evidence relevant to those issues, the Court remanded the case for further proceedings. Id. at 269. The Court, however, left open the possibility that an ALJ's failure to adhere to the regulations' special technique might be harmless error under other facts and circumstances. Id.

Since <u>Kohler</u>, virtually every court in this Circuit that has encountered this issue - including two decisions from this District - has reversed and remanded the matter to the Commissioner for further proceedings.  <u>See</u> <u>Kochanek v. Astrue</u>, No. 08-CV-3101, 2010 WL 1705290, at *6 (N.D.N.Y. Apr. 13, 2010) (remanding where the ALJ did not reference the special technique or make a specific finding as to each of the functional areas), <u>adopted by</u>, 2010 WL 1713438 (N.D.N.Y. Apr. 28, 2010); <u>Wong v. Astrue</u>, No. CV-06-2949, 2010 WL 1268059, at *10 (E.D.N.Y. Mar. 31, 2010) (remanding where the ALJ failed to document 20 C.F.R. § 404.1520a findings); <u>Duell v. Astrue</u>, No. 8:08-CV-969, 2010 WL 87298, at *7 (N.D.N.Y. Jan. 5, 2010) (remanding where the ALJ failed to complete a distinct analysis of the degree of limitation in each functional area); <u>Holland v. Comm'r of Social Security</u>, No. 7:05-CV-0384, 2009 WL 3790190, at *3 (N.D.N.Y. Nov. 12, 2009) (remanding for development of the record and appropriate application and documentation of the special technique for evaluating mental impairments); <u>Oakes v. Astrue</u>, No. 5:06-CV-0332, 2009 WL 1109759, at *11 (N.D.N.Y. Mar. 5, 2009)(remanding case where the ALJ failed to complete the special technique); <u>Serrano v. Astrue</u>, 645 F. Supp. 2d 64, 66 (D. Conn. 2009)(remanding where ALJ failed to follow the framework established by the regulations for evaluating the severity of a claimant's mental impairments at steps two and three); <u>Buccheri v. Astrue</u>, 586 F. Supp. 2d 54, 63 (D. Conn. 2008) (remanding where ALJ failed to apply the analysis required by 20 C.F.R. § 404.1520a); <u>but see</u> <u>Arguinzoni v. Astrue</u>, No. 08-CV-6356-T, 2009 WL 1765252, at **8-9 (W.D.N.Y. June 22, 2009) (finding that the ALJ's failure to document specific findings as to the plaintiff's limitations was harmless error and, therefore, a remand was not necessary).

Here, the ALJ's decision does not even address the "special technique" required by 20

C.F.R. § 1520a, nor does he make any findings as to Plaintiff's functional limitations in all four areas of daily living, maintaining social functioning, difficulties in maintaining concentration, persistence, or pace, and repeated episodes of decompensation - although the Court recognizes that there is no evidence in the record of such episodes - when Plaintiff was not abusing drugs and alcohol.  Even when he discussed the "B" criteria under Listing 12.04 when Plaintiff was abusing drugs and alcohol, he only mentioned two of the four functional limitations. Accordingly, based on the Second Circuit's decision in Kohler, which is controlling precedent, the Court finds that a remand is required for the ALJ to follow the "special technique" set forth in 20 C.F.R. § 1540a(c)(3) and document his findings as to Plaintiff's limitations in each of the four functional areas.

VII.  Whether the ALJ improperly found that drug and alcohol abuse were material to the determination of disability?

Plaintiff next argues that substantial evidence does not support the ALJ's assessment of the materiality of Plaintiff's substance abuse with respect to her mental impairment, citing Dr. Lago's lack of a diagnosis of polysubstance abuse and arguing that Plaintiff continued to exhibit disabling symptoms of depression when she was not abusing drugs and alcohol.

Plaintiff 's argument ignores the fact that she specifically denied any history of substance of abuse to Dr. Lago, who performed only a consultative examination and was not a long-term treating physician.  Thus, it is understandable that his diagnoses did not include polysubstance abuse.

As for Plaintiff's functional impairments caused by her depression when she was not abusing drugs and alcohol, the Court is remanding this case for further findings pursuant to 20

C.F.R. § 404.1520a.  Therefore, the Court need not address Plaintiff's additional arguments at this time.

VIII.  Whether the ALJ properly determined Plaintiff's credibility?

Plaintiff's next assignment of error is that the ALJ did not properly assess Plaintiff's credibility.  To the extent that she relies on the alleged factual errors discussed above, the Court has already addressed these issues and incorporates by reference its rulings on these issues.  The one new argument raised by Plaintiff is that the ALJ erred in not relying on her good work record to enhance the credibility of her statements that she can no longer work.

When determining a claimant's RFC, the ALJ is required to take into account the claimant's reports of pain and other limitations.  20 C.F.R. §§ 404.1529, 416.929.  He is not required, however, to accept the claimant's subjective complaints without question.  Instead, he may weigh the credibility of the claimant in light of the other evidence of record.  Genier, 2010 WL 2105081, at *3.  The regulations set forth a two-step process for evaluating a claimant's complaints of pain and other limitations.  At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged.  20 C.F.R. §§ 404.1529(b), 416.929(b).  At the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record.  Id.

Here, the ALJ, in rejecting Plaintiff's testimony as to severity of her symptoms, applied the proper analysis set forth in the regulations (R. 16), and reasonably relied on the medical evidence in the record, the reports of the state agency medical consultants, her failure to obtain prescribed treatment, her lack of candor with Dr.Lago, and her drug-seeking behavior (R. 16-18).

25

He also noted that she was working eight to ten hours a week (R. 18), but found no reason why she could not sustain this job on a full-time basis. He did not, however, consider her past work record to bolster the credibility of her statement that she cannot work.

As for Plaintiff's work record, "[t]o be sure, 'a good work history may be deemed probative of credibility.'" Carvey v. Astrue, No. 09-4438-cv, 2010 WL 2264932, at *3 (2d Cir. June 7, 2010) (quoting Schaal, 134 F.3d at 502 (noting that "[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability")). "Work history, however, is 'just one of many factors' appropriately considered in assessing credibility." Id. (quoting Schaal, 134 F.3d at 502)).   While Plaintiff points out that she had steady earnings from 1979 to 1987 and 1997 to 2006, the record does not necessarily support what one would call a "good work record."  Plaintiff offers no explanation as to why she was not working for ten years between 1987 and 1997.  Also, the Court notes that, in several of the years in which she did have earnings, her earnings were extremely low, indicating part-time or sporadic employment at best.  (R. 98-99).

It is the function of the ALJ, not the reviewing court, to resolve evidentiary issues and to appraise the credibility of the claimant.  Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).  The Court finds no error in the ALJ's failing to rely on her work record and finds that substantial evidence supports his credibility assessment.

IX.  Whether the ALJ improperly determined Plaintiff's RFC?

Plaintiff's last argument is that the ALJ failed to properly determine her RFC in that he did not make specific findings as to her physical limitations (e.g., how many hours she could sit or stand in an eight-hour workday, or how many pounds she could lift occasionally) or as to her

26

mental functions (e.g., her memory, focus, persistance, stress tolerance).   Here, the ALJ

determined that Plaintiff could perform work at the light level of exertion, as defined in 20

C.F.R. §§ 404.1567(b) and 416.967(b), which requires the ability to lift up to 20 pounds

occasionally, lift 10 pounds frequently, stand and walk for up to 6 hours a day, and sit for up to

two hours in an eight-hour workday.  SSR 83-10, 1983 WL 31251, at *5-6 (1983).  Yet, as

Plaintiff points out, despite his finding that her chronic back pain was a severe impairment, the

ALJ made no specific findings as to her exertional capabilities, and there appear to be none in the

record.  The only records relating to treatment for her back problems are from Norwalk

Community Hospital and Health Center.  None of these records discuss her ability to lift, sit, or

stand and walk, which are critical to a determination of her RFC.  Additionally, no RFC

assessment was performed.

Social Security Ruling 96-8p provides that the RFC assessment must include a discussion

of the individual's maximum remaining ability to do sustained work activities in an ordinary

work setting on a regular and continuing basis and must be based on all relevant evidence in the

record.  SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996).  In assessing an individual's

exertional capacity, the Ruling states that each function - sitting, standing, walking, lifting,

carrying, pushing and pulling - must be considered separately.  Id. at *5.   The RFC assessment

"must include a narrative discussion describing how the evidence supports each conclusion,

citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily

activities, observations) . . . and must describe the maximum amount of each work-related

activity the individual can perform based on the evidence available in the case record."  Id. at *7

(emphasis added).

In this case, the ALJ failed to include findings as to Plaintiff's ability to perform the specific functions required for light work.  Therefore, this matter should be remanded for further findings in this regard, including obtaining an RFC assessment from a medical source, if necessary.

## Conclusion

For the reasons set forth above, the Court concludes that this matter should be reversed and remanded under sentence four of 42 U.S.C. § 405(g) for further proceedings.   On remand, the ALJ should be instructed to (1) to confirm that he did not have an opinion from a medical expert and to explain the reasons that he was in agreement with the FRO.  If he did refer to an opinion from a medical expert, that opinion must be provided to Plaintiff's counsel and Plaintiff's counsel must be given an opportunity to respond with additional evidence, if necessary; (2) to make specific findings and to document those findings as to the degree of limitation caused by Plaintiff's mental impairment in each of the four functional areas set forth in 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3) as required by Kohler; and (3) to make findings and document those findings as to Plaintiff's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, describing the amount of each work-related activity Plaintiff could perform, and, if necessary, to obtain an RFC assessment from a medical source.

Accordingly, the Court recommends that Plaintiff's Motion to Reverse and Remand [Doc. # 18] be granted in part and denied in part and that this matter be remanded for further proceedings in accordance with this decision.  The Court recommends that Defendant's Motion to Affirm [Doc. # 25] be denied.

This is a Recommended Ruling.  <u>See</u> Fed. R. Civ. P. 54(d)(2)(D) and 72(b)(1).  Any objection to this Recommended Ruling must be filed within 14 days after service.  <u>See</u> Fed. R. Civ. P. 72(b)(2).

SO ORDERED, this ____1st_____ day of July, 2010, at Bridgeport, Connecticut.


_____/s/ *William I. Garfinkel*_____
WILLIAM I. GARFINKEL
United States Magistrate Judge